IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LEGACY SEPARATORS, LLC, and GUY MORRISON III<br>Plaintiffs,<br><br>v.<br><br>HALLIBURTON ENERGY SERVICES, INC., HALLIBURTON GLOBAL DIT, INC., GLOBAL OILFIELD SERVICES, LLC, OILFIELD PRODUCTS SUPPLY CORPORATION, PINE BROOK ROAD PARTNERS LLC d/b/a PINE BROOK PARTNERS, and J. WAYNE RICHARDS,<br>Defendants. | Civil Action No. 4:14-cv-02081, consolidated with Civil Action No. 4:14-cv-03110<br><br>JURY TRIAL DEMANDED |
| HALLIBURTON ENERGY SERVICES, INC.,<br>Counter-Plaintiff,<br><br>v.<br><br>LEGACY SEPARATORS, LLC, and GUY MORRISON III<br>Counter-Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiffs Legacy Separators, LLC, ("Legacy") and Guy Morrison III ("Morrison") allege the following causes of action against Defendants Halliburton Energy Services, Inc. ("Halliburton"), Halliburton Global DIT, Inc. ("Halliburton DIT"), Global Oilfield Services, LLC d/b/a Global Artificial Lift ("Global"), Oilfield Products Supply Corporation ("OPSC"), Pine Brook Road Partners, LLC d/b/a Pine Brook Partners ("Pine Brook"), and J. Wayne Richards ("Richards") (collectively "Defendants") and states:

## Nature of the Action

1. This is an action for patent infringement, trade secret misappropriation, breach of contract, and fraud arising out of Defendants' wrongful disclosure of Plaintiffs' trade secrets and confidential information, Defendants' attempts to conceal this wrongful conduct through fraud, and the continued use of Plaintiffs' trade secrets and patented invention concerning downhole gas separation in the oilfield services industry.

## The Parties

### A. Plaintiffs

2. Legacy is an Oklahoma limited liability company whose principal place of business is in Wood County, Texas.

3. Morrison is the managing member of Legacy, the inventor of the trade secrets at issue in this case, as well as the inventor of two patents related to downhole gas separators. He is a Texas citizen and resides in Wood County, Texas.

### B. Defendants

4. Halliburton is a Delaware corporation, whose principal place of business is in Harris County, Texas.

5. Halliburton DIT is a Delaware corporation, whose principal place of business is in Harris County, Texas.

6. Global was a Delaware limited liability company, whose principal place of business was in either Harris or Fort Bend County, Texas. Halliburton acquired Global on November 1, 2011 and merged with Global in August 2013.

7. OPSC was a Cayman Islands corporation, whose principal place of business was in either Harris or Fort Bend County, Texas. OPSC regularly conducted business in Texas.

8. Pine Brook is a Delaware limited liability company, whose principal place of business is either New York City, New York or Harris County, Texas. Pine Brook regularly conducts business in Harris County, Texas.

9. Richards was the President and Chief Executive Officer of Global, and later an employee of Halliburton. He is a Texas citizen and resides in either Harris or Fort Bend County, Texas.

**Jurisdiction and Venue**

10. Plaintiff brings its complaint under federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 with supplemental state claims pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over the Defendants based on the following:

A. Halliburton maintains its principal place of business in this District;

B. Halliburton DIT maintains its principal place of business in this District;

C. Global maintained its principal place of business in this District;

D. OPSC maintained its principal place of business in this District and/or regularly conducted business in this District;

E. Pine Brook maintains its principal place of business in this District and/or regularly conducts business in this District; and

F. Richards is a Texas citizen and resides in this District.

11. Venue is proper in this District under 28 U.S.C. §1391 because the events giving rise to this claim occurred within this District and the Defendants consented to venue in Harris County, Texas

## Fact Allegations

**A. Downhole Gas Separation Technology**

12. Morrison is an entrepreneur with expertise in downhole gas separation in oil and gas wells. Having spent his career in the oil industry, he is an expert in the design and use of technology that separates gas from liquid downhole, where the produced fluid first enters the wellbore. He is the named inventor on two patents relating to downhole gas separation, including U.S. Patent No. 6,761,215 (the "'215 Patent"). The '215 patent is now owned by Halliburton and is not the basis for Legacy's infringement claims in this suit.

13. Downhole separators are used with downhole submersible pumps to "lift" the produced fluid to the surface. After flowing into the wellbore from the formation, the fluid enters the downhole separator, where the gas is separated from the liquid, and the liquid flows into the submersible pump, which pumps it to the surface.

14. Conventional downhole separators tend to allow gas to remain in the fluid entering the submersible pump. High gas concentrations in production fluid cause cavitation and gas lock in submersible pumps, resulting in excess wear and tear. Ineffective downhole separation leads to increased costs associated with repairing and replacing submersible pumps, as well as poor well performance.

15. For years, including the years since his original '215 patent issued, Morrison worked to improve technology for separating gas downhole, to increase well performance and reduce operating costs. In 2009, he had a groundbreaking new idea for a downhole gas separator and its methods of operation.

16. Conventional downhole separators are operated such that the separation chamber below the submersible pump is filled with fluid. Morrison realized that, if the chamber is always full, there is no space to allow the gas to separate from the liquid. His invention limits the

amount of fluid flowing into the separation chamber and operating the submersible pump at a higher rate than the flow into the chamber, causing the chamber to be only partly full.

17.     By partially vacating the separation chamber, space is provided for the gas to separate from the liquid. The liquid moves to the periphery of the chamber, and the gas moves to the center. The gas then flows to the well annulus, and the liquid flows to the submersible pump and is pumped up the tubing.

18.     This invention is the subject of Morrison's second patent, U.S. Patent No. 8,424,597 (the "'597 Patent"), entitled "Downhole Gas and Liquid Separation."

19.     Through his experience in the industry, Morrison also possesses trade secrets related to the design and use of downhole gas separators.

**B.     Legacy Downhole Gas Separators**

20.     After filing for what would become the '597 Patent, Morrison began to form a company that would sell gas separators utilizing his technology. During negotiations with potential customers, Morrison took appropriate measures to protect the confidentiality of his technology.

21.     In April 2010, Morrison formed Legacy Separators, LLC to manufacture, sell, install, and service his separator technology. He is the 80% owner of Legacy, which owns the highly valuable and confidential technical data for optimized configurations and operation of the technology. He knows, for example, how to configure and operate downhole separators to optimize gas separation and well production, based on the physical characteristics of particular oil and gas wells.

22.     Legacy's confidential data about its technology gives it a competitive advantage in the industry. If used properly, Legacy's technology significantly increases production from oil

and gas wells, reduces certain problems in other oilfield equipment, such as breakdowns, delays, repairs, and deterioration, and allows well operators to use less expensive and more efficient production equipment in combination with Legacy's technology.

**C.      Global Oilfield Services**

23.      Global was an oilfield services company based in Sugar Land, Texas, backed by Pine Brook, a New York private equity firm. Richards was Global's President and CEO. Pine Brook and Richards formed Global in 2009, as part of a plan to build a business around a gap in products or service lines of the major oilfield services companies. It was built to be sold to a "major" like Halliburton, Schlumberger, or GE Oil & Gas. Its founders decided to focus on artificial lift and started by buying a small submersible pump company called Green Country.

24.      In January 2010, after learning about the successful testing of Morrison's new separators, Global approached Morrison to purchase the separators. Richards was involved in the negotiations. To protect his trade secrets, Morrison required Global to sign a binding Nondisclosure Agreement ("NDA") effective January 19, 2010, by which Global promised not to disclose any Morrison secrets or otherwise confidential information, or any information that contains, reflects or is derived from secrets or confidential information furnished by Morrison, without the prior written consent of Morrison. The NDA remained in effect through January 19, 2012.

25.      After executing the NDA, Morrison provided confidential information about his technology to Global. Global acknowledged at the time that Morrison's separators were a significant technological development and expressed interest in entering into a formal agreement with Morrison's soon-to-be-formed company, Legacy.

**D.      Global and Legacy Enter into a Master Supply Agreement.**

26.      On April 13, 2010, Legacy and Global reached an agreement embodied in the Master Supply Agreement ("Agreement"). Before the Agreement was signed, Global represented that its affiliate OPSC, a Cayman Islands company, would be its signatory to the Agreement. Global then secured Legacy's permission to assign the Agreement from OPSC back to Global. Legacy consented to the assignment, shortly after the Agreement was signed. Due to the assignment, Global assumed all of OPSC's covenants and duties under the Agreement.

27.      Under the Agreement, Legacy is to sell its separators exclusively to Global. Global is obligated to pay for a minimum number of separators each year while the Agreement is in effect, even if it does not buy any in a year. If Global fails to pay this minimum amount, the exclusivity ends.

28.      The Agreement requires Global to maintain strict secrecy of Legacy's secrets and confidential data. Global is prohibited from disclosing Legacy's confidential data to anyone for any reason, and it may not disclose any other information not known to the public concerning the Legacy separators, business, technology, or affairs. Global can only use Legacy's confidential data in connection with performing under the Agreement and as directed by Legacy in writing. The terms of the Agreement, as well as its very existence, are confidential data.

29.      Global cannot assign the Agreement without Legacy's consent, unless the assignment is to an affiliate and does not relieve Global of its obligations. Any other assignment or transaction is void. Legacy can terminate the Agreement if Global commits a breach and fails to cure the breach within a specified time. Legacy can also terminate if Global makes a material misrepresentation. The Agreement is governed by Texas law, and disputes are to be decided in the courts in this County.

**E. Global discloses Legacy's confidential data to Halliburton.**

30. While operating under the Agreement, Global purchased separators from Legacy and resold them to customers. As part of the sales process, Global would describe to Legacy the physical characteristics of the well in which each separator was to operate. Based on the description, Legacy would then provide Global with the optimized configuration for its separator in a particular well. Legacy told Global's principals, including Richards, that Legacy would disclose this confidential technical data for separator optimization only to a select group of Global employees on a need-to-know basis only, in order to keep the data as protected as possible.

31. By at least July 2011, Pine Brook and Global or their affiliates began secret buyout talks with Halliburton. When Legacy asked whether there were such talks, however, Global denied it.

32. During the negotiations with Halliburton, Global and Pine Brook disclosed Legacy's confidential technical and business data, without Legacy's knowledge or consent. Global and Pine Brook were intent on a rich buyout, as they had planned from the outset, and they knew that the valuable Legacy technology would entice Halliburton. The disclosures included the existence and terms of the Agreement, Legacy's confidential data concerning optimized configurations for the separator technology, and Legacy's non-infringement position concerning Morrison's original '215 patent (then owned by a third party company).

33. Some of Global's improper disclosures occurred after Halliburton had seen a copy of the Agreement. At that point, Halliburton did know or should have known that the disclosures violated Global's duty to maintain the secrecy of Legacy's data.

34.     At the time of Global's improper disclosures, Halliburton was not an affiliate of Global or OPSC. Rather, Halliburton was a competitor of Legacy, as it is today.

35.     In October 2011, Halliburton purchased all of Global's stock for a sum of about $200 million. The stock purchase agreement has an earn-out clause, by which the sale price would increase if Global increased its sales in 2012. Using Legacy's technology and data, Global did increase its sales that year, which further enriched it, by raising its final sale price. The final purchase price, including tangible assets, was about $365 million.

36.     After Halliburton's acquisition of Global, certain Global employees, including Richards, to whom Morrison and Legacy had disclosed confidential business and technical data on a need-to-know basis and under terms of secrecy, became employees of Halliburton.

**F.     Legacy Discovers that Global/Halliburton Are Re-Assembling and Re-Manufacturing Gas Separators Originally Purchased from Legacy**

37.     After Global disclosed the Halliburton acquisition to Legacy, Legacy informed Global that it had breached the Agreement through its misappropriation of Legacy's confidential information and the material misrepresentations Global made to Legacy about the sale. Standing on its claim that the Agreement was breached, Legacy separately attempted to negotiate the terms of a new contract with Global/Halliburton throughout 2012 and part of 2013, but the negotiations broke down and were unsuccessful.

38.     In the meantime, Global/Halliburton continued to purchase separators from Legacy, and Legacy delivered the separators under protest, subject to its claim that the Agreement was breached.

39.     Around November of 2012, Legacy discovered that Global/Halliburton were re-assembling and remanufacturing gas separators originally purchased from Legacy, allowing Global/Halliburton to provide separators to customers without paying Legacy as required under

the Agreement. Prior to this time, Legacy had been assured by Global/Halliburton that Global/Halliburton were not re-assembling/remanufacturing gas separators provided by Legacy.

40. On information and belief, Halliburton continues to re-assemble and remanufacture gas separators originally purchased from Legacy without Legacy's permission.

41. Halliburton's continued re-assembly and remanufacture of gas separators is without Legacy's authorization, is not permitted under the Agreement, and leads to infringement of Legacy's '597 patent.

**G. Halliburton's Manufacture of New Separators that Infringe Legacy's '597 Patent.**

42. After Legacy filed suit against Halliburton for infringing the '597 Patent by re-assembling and remanufacturing gas separators originally purchased from Legacy, Halliburton ceased placing orders for new separators from Legacy. However, Halliburton continues to market gas separators. On information and belief, including the eyewitness accounts of former Global/Halliburton employees responsible for making such devices, Halliburton is manufacturing and selling new separators that practice the '597 Patent. This new manufacture of separators is separate from the re-assembly and remanufacture of gas separators originally purchased from Legacy.

**First Cause of Action**

**(Breach of Contract –Master Supply Agreement)**

43. Plaintiffs incorporate the material fact allegations of the preceding paragraphs

44. Plaintiffs bring this cause of action against all Defendants except Pine Brook.

45. The Agreement was a valid and enforceable contract. OPSC assigned it to Global, which assumed all covenants and obligations under the Agreement.

46. Halliburton acquired Global in 2011 and merged with Global in 2013 and is responsible for Global's debts, liabilities, and obligations.

47. Plaintiffs did and still do perform the terms of the Agreement, under protest, and have notified Global and Halliburton to this effect. To the extent Plaintiffs have not performed any term of the Agreement at any time, their failure is excused by Defendants' material breaches.

48. Defendants have breached the Agreement in numerous respects, including by disclosing Legacy's confidential data without its permission; by entering into prohibited transactions and assignments of their rights and duties under the Agreement; by failing to issue purchase orders or pay a no-purchase fee for a minimum number of separators in April 2015; and by making material misrepresentations, including that Global was not being acquired by Halliburton, that neither Global or Halliburton was re-assembling or remanufacturing used gas separators originally purchased from Legacy, and that they had not and would not disclose Legacy's confidential data to Halliburton or anyone else. At the time Defendants made these representations to Legacy, they were false.

49. These breaches have caused Plaintiffs to suffer injury, which was the natural, probable, and foreseeable consequence of the breaches. Accordingly, Plaintiffs seek all remedies provided by law, including actual damages, attorney fees, costs, and interest.

50. All conditions precedent to the filing of this lawsuit for breach of the Agreement have been satisfied, waived, or otherwise performed.

**Second Cause of Action**
**(Breach of Contract –Nondisclosure Agreement)**

51. Plaintiffs incorporate the material fact allegations of the preceding paragraphs.

52. Morrison brings this cause of action against all Defendants except Pine Brook.

53. The NDA was a valid and enforceable contract between Morrison and Global.

54. Morrison has performed all his duties and obligations under the NDA.

55. Defendants have breached the NDA in numerous respects, including by failing to provide prompt written notice to Morrison that they intended to disclose to Halliburton confidential information furnished by him to Global, and by disclosing information protected by the NDA to Halliburton before the acquisition or by disclosing confidential information to employees who did not need to know without Morrison's permission.

56. These breaches caused Morrison to suffer injury, which was the natural, probable, and foreseeable consequence of the breaches. Accordingly, Morrison seeks all remedies provided by law, including actual damages, attorney fees, costs, and interest.

57. All conditions precedent to the filing of this lawsuit for breach of the NDA have been satisfied, waived, or otherwise performed.

**Third Cause of Action**
**(Trade Secret Misappropriation)**

58. Plaintiffs incorporate the material fact allegations of the preceding paragraphs.

59. Legacy brings this cause of action against all Defendants.

60. Legacy's confidential technical data regarding its technology includes valuable trade secrets, including its knowhow and understanding of the means to optimize configurations of gas separators for particular well conditions, as well as the non-infringement position with respect to the '215 patent (originally invented by Morrison). Likewise, its confidential business information regarding the gas separator and oilfield services industry includes valuable trade secrets, including its pricing information and the existence and terms of the Agreement.

61. Defendants did and do sell gas separators that require configuration settings derived from Legacy's trade-secret and otherwise confidential data. They disclosed or used this data in violation of confidential or contractual relationships with Plaintiffs. They disclosed or

used this data after acquiring it through improper means and with notice that the disclosure was improper. They did and continue to disclose or use this data for purely commercial gain.

62. Defendants' improper disclosures or uses caused Legacy to suffer injury, for which it seeks all remedies provided by law, including actual damages, attorney fees, punitive damages, exemplary damages, disgorgement, restitution, unjust enrichment, costs, and interest. Legacy seek injunctive relief to prevent the continued disclosure or use of their trade secrets.

**Fourth Cause of Action**
**(Aiding and Abetting Trade Secrets Misappropriation)**

63. Plaintiffs incorporate the material fact allegations of the preceding paragraphs.

64. Legacy brings this cause of action against any Defendants not otherwise directly liable for Plaintiffs' Third Cause of Action (Trade Secrets Misappropriation).

65. Defendants misappropriated Legacy's trade secrets through their wrongful use or disclosure of its confidential business and technical information.

66. Any Defendants not directly liable for trade secrets misappropriation had knowledge that the other Defendants' wrongful disclosure or use of Legacy's trade secrets constituted a tort. For example, Pine Brook, if it not directly liable for trade secrets misappropriation, had knowledge of the confidential relationship between Plaintiffs and Global. Pine Brook also had knowledge of the other Defendants' promises, in the Agreement, NDA, and elsewhere to protect Legacy's confidential information and not disclose that information without Legacy's written permission.

67. Any Defendants not directly liable for trade secrets misappropriation intended to assist or encourage Global, Halliburton, and Richards to commit the trade secrets misappropriation.

68. Any Defendants not directly liable for trade secrets misappropriation provided assistance or encouragement to the other Defendants to commit the misappropriation of Legacy's trade secrets. For example, Pine Brook, if it is not directly liable for trade secrets misappropriation, assisted or encouraged Defendants to breach their confidential relationships with Plaintiffs and disclose or use Legacy's information in violation of those relationships.

69. The assistance and encouragement provided by any Defendants not directly liable for trade secrets misappropriation were a substantial factor in the other Defendants committing the misappropriation of Legacy's trade secrets.

70. This aiding and abetting of trade secrets misappropriation caused Legacy to suffer injury, for which it seeks all remedies provided by law, including actual damages, attorney fees, punitive damages, exemplary damages, disgorgement, restitution, unjust enrichment, costs, and interest. Legacy seeks injunctive relief to prevent the continued disclosure or use of its trade secrets.

**Fifth Cause of Action**
**(Patent Infringement)**

71. Plaintiffs incorporate the material fact allegations of the preceding paragraphs.

72. Legacy brings this cause of action against all Defendants except Pine Brook.

73. Halliburton and Global have directly and indirectly infringed and Halliburton continues to infringe the '597 Patent by re-assembling and remanufacturing gas separators that utilize methods that are encompassed within the scope of the '597 Patent. Further, Halliburton and Global have induced infringement of the '597 Patent or have committed acts of contributory infringement of the '597 Patent by encouraging their customers or well operators to use the re-assembled and re-manufactured separators that are especially made and adapted to practice the '597 patent.

74. Halliburton and Global have infringed and Halliburton is continuing to infringe the ’597 Patent by engaging in acts including making, using, selling, or offering to sell within the United States, or importing into the United States, products that utilize methods that are encompassed within the scope of the ’597 Patent. Further, Halliburton and Global have induced infringement of the ’597 Patent or have committed acts of contributory infringement of the ’597 Patent by encouraging their customers or well operators to use the infringing separators that are especially made and adapted to practice the ’597 patent.

75. Halliburton and Global’s activities have been without express or implied license from Legacy.

76. Halliburton will continue to infringe the ’597 Patent unless enjoined by this Court. As a result of Halliburton and Global’s infringing conduct, Legacy has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law. Thus, Legacy is entitled to permanent injunctive relief against such infringement, under 35 U.S.C. § 283.

77. As a result of the infringement of the ’597 Patent, Legacy has been damaged, will be further damaged, and is entitled to be compensated for such damages, pursuant to 35 U.S.C. § 284, in an amount to be determined at trial.

78. Halliburton and Global knew that re-assembly, remanufacture and use of gas separators provided by Legacy would constitute or lead to infringement of the ’597 patent. Halliburton further knew that manufacturing, selling and using new separators not provided by Legacy and designed to practice the ’597 patent would constitute or lead to infringement of the ’597 patent. Halliburton and Global have known of the ’597 patent since it issued in April 2013. And Halliburton was told by Legacy around this time that Halliburton’s continued use and sales

of these new and re-assembled/remanufactured gas separators would constitute or lead to infringement of the ’597 patent.

79. Halliburton and Global’s past and continuing infringement has been deliberate and willful. This case therefore warrants an award of treble damages, pursuant to 35 U.S.C. § 284, and is an exceptional case justifying an award of attorney fees to Legacy, pursuant to 35 U.S.C. § 285.

**Sixth Cause of Action**
**(Fraudulent Misrepresentation)**

80. Plaintiffs incorporate the material fact allegations of the preceding paragraphs.

81. Plaintiffs bring this cause of action against all Defendants.

82. Defendants made material, false representations to Plaintiffs.

83. At the time these and were made, Defendants knew they were false or made the representations recklessly, as a positive assertion, and without knowledge of their truth.

84. The material false representations included the following:

A. In August 2011, Morrison asked Richards whether Global’s proposal to test Legacy’s separators in a lab was related to a potential sale of Global. If so, Morrison reminded Richards of Global’s contractual obligations to protect Legacy’s confidential information. In response, Richards assured Morrison that the testing was for Global marketing materials, not a sale. Richards then stated “I am not going to do anything with the technology without your approval ! Let’s go fishing !!” However, Richards and Global knew this statement was false, as they had already or were already planning to disclose Plaintiffs’ confidential information without Plaintiffs’ consent.

B. In June 2011, Morrison asked Tommy Vineyard, a senior executive at Global, whether Global was ordering extra gas separator parts in order to remanufacture or re-assemble

Legacy-supplied gas separators. If so, Morrison reminded Vineyard of Global's contractual obligation to pay Legacy for such remanufactured or re-assembled separators under the Agreement. Morrison conceded that replacing just a "few parts" would not be a problem under the Agreement. Vineyard responded that Global needed the extra parts so that it could have the parts coated with a material to make them resistant to abrasive downhole conditions. Vineyard then stated: "If we do build back any units with parts, it will be to repair units that only stayed in the hole a short time was [sic] worn due to abrasives, or if there seems to be any issues with parts, but will go back into wells with our used equipment, or I will say that is the intent. The intent is not to sell used units on new applications." In reality, Vineyard and Global were remanufacturing and re-assembling Legacy-supplied separators in order to avoid paying Legacy under the Agreement and were selling these used units on new applications.

85.     Defendants intended for Plaintiffs to act on these misrepresentations, and Plaintiffs did rely on these misrepresentations, including by not terminating the Agreement, as they had a right to do if Defendants' conduct had been made known. Termination of the Agreement would have allowed Plaintiffs to sell their now proven separators and/or technology on the open market.

86.     Defendants' misrepresentations caused Plaintiffs to suffer injury, for which they seeks all remedies provided by law, including actual damages, attorney fees, punitive damages, exemplary damages, disgorgement, restitution, unjust enrichment, costs, and interest.

**Seventh Cause of Action**
**(Fraudulent Inducement)**

87.     Plaintiffs incorporate the material fact allegations of the preceding paragraphs.

88.     Plaintiffs bring this cause of action against all Defendants.

89.     Defendants made material, false representations to Plaintiffs.

90. At the time these and were made, Defendants knew they were false or made the representations recklessly, as a positive assertion, and without knowledge of their truth.

91. The material false representations included the following:

A. On or about March 31, 2010, Global executives, including Richards, met with Morrison in Global's offices in Sugar Land, Texas and told him that they did not intend to sell Global for at least eight years, and promised him that in the event of any such sale, they would not disclose any of Legacy's confidential information to any prospective buyer without Morrison's prior approval. In reality, the Defendants had no intention to fulfill the promise to seek Morrison's prior approval before providing Legacy's confidential information to a prospective buyer. At the time, Defendants had the intention to sell Global as soon as possible to Halliburton, Schlumberger or GE, and during negotiations with potential buyers, Defendants intended to disclose Legacy's confidential information for their mutual benefit, while keeping such sales negotiations and improper disclosure secret from Morrison.

92. Defendants intended for Plaintiffs to act on these misrepresentations, and Plaintiffs did rely on these misrepresentations, including by entering into the Agreement, which Plaintiffs would not have done if Defendants' actual intentions had been made known. By not entering into the Agreement, Plaintiffs would have been able to sell their separators and/or technology by other means.

93. Defendants' misrepresentations caused Plaintiffs to suffer injury, for which they seeks all remedies provided by law, including actual damages, attorney fees, punitive damages, exemplary damages, disgorgement, restitution, unjust enrichment, costs, and interest.

**Prayer**

94. Therefore, Plaintiffs respectfully request that, after final hearing or trial, the Court enter judgment against Defendants, jointly and severally, and award to Plaintiffs their actual

damages; exemplary damages; reasonable and necessary attorney fees; pre- and post-judgment interest; costs; equitable relief; and all other relief at law or in equity to which they are entitled.

Dated: September 4, 2015

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
Attorney in Charge
pyetter@yettercoleman.com
Eric P. Chenoweth
State Bar No. 4006989
echenoweth@yettercoleman.com
Pamela L. Hohensee
State Bar No. 09812250
phohensee@yettercoleman.com
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 (Fax)

Attorneys for Plaintiff
Legacy Separators, LLC

Of Counsel:

Mitchell K. McCarthy
Hall, Estill, Hardwick, Gable,
Golden & Nelson
100 N. Broadway, Suite 2900
Oklahoma City, Oklahoma 73102
(405) 553-2828
(405) 232-8004 (Fax)

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on September 4, 2015.

*/s/ Eric P. Chenoweth*
Eric P. Chenoweth